Dwane J. SYKES, Appellant,

v.

MELBA CREEK MINING, INC.,
and Fairbanks Gold Mining,
Inc., Appellees.

No. S–6759.

Supreme Court of Alaska.

Jan. 30, 1998.

Dwane J. Sykes, Orem, UT, pro se.

George R. Lyle, Guess & Rudd, Anchorage, for Appellees.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

BRYNER, Justice.

Melba Creek Mining, Inc., and Fairbanks Gold Mining, Inc., (collectively MCM) filed a superior court action against Dwane Sykes (Sykes), claiming that Sykes had failed to perform on a contract to convey to MCM his mineral rights to a parcel of land near Fairbanks. Following a non-jury trial, Superior Court Judge Niesje J. Steinkruger entered judgment for MCM in the amount of $159,259.16. On appeal, Sykes challenges the trial court's grant of partial summary judgment to MCM, claims that the court erred in entering an order precluding him from calling witnesses at trial, and contests the award of damages. We affirm the partial summary judgment order, reverse the order precluding Sykes from calling witnesses at trial, and remand for further proceedings; we also conclude that if the superior court enters a verdict in MCM's favor on remand, the court must reconsider its original award of compensatory damages and prevailing party attorney's fees.

I. *FACTS AND PROCEEDINGS*

In 1992, MCM planned to excavate and develop a parcel of land near Fairbanks; Sykes, a Utah resident, owned mineral rights to the land. On June 3, 1992, Robert Tsigonis, an environmental engineer/land coordinator for MCM in Fairbanks, telephoned Sykes in Utah to negotiate MCM's purchase of Sykes's mineral rights. A series of calls ensued, culminating on June 30 in Sykes's verbal agreement to deed the mineral estate to MCM for $10,000.

Two days later, Tsigonis faxed a written agreement to Sykes. That same day, Tsigonis offered to fly to Utah to deliver a $10,000 check in exchange for Sykes's deed. In response to this offer, Sykes confirmed his willingness to accept $10,000 for the deed but suggested having MCM fly him to Fairbanks, so that he could conduct other business there. Tsigonis agreed to this arrangement. Sykes signed and returned to Tsigonis the faxed agreement. Tsigonis purchased an airline ticket for Sykes, and, on July 13, Sykes flew to Fairbanks. Following his arrival, however, Sykes avoided Tsigonis, failed to claim his $10,000 check, and never delivered the promised deed.

On July 16, Sykes wrote Tsigonis a letter disclaiming any intent to sell MCM the min-

eral rights. In the letter, Sykes claimed that he had "no recollection of signing or sending anything, or if so, no idea what I may have been signing or doing on July 3, 1992, or thereabout." Sykes wrote that he "thought it was simply a preliminary document" and that the parties would "negotiate further at a later date." Sykes further explained:

As you undoubtedly recall from our phone conversations, my emotional state was and remains quite delicate. At the time we were discussing these matters, as I then told you, I was heavily medicated with prozac, anafranil, lithium, and other drugs, under orders of my psychiatrist and physician. Hence I did not know what I was doing.

The following day, July 17, Sykes quit-claimed his mineral rights to Max Ferre, a Utah resident, purportedly in exchange for Ferre's payment to Sykes of $51,000. Several days later, on July 21, Tsigonis received Sykes's July 16 letter disclaiming the agreement to sell the mineral rights to MCM.

On July 24, MCM filed suit against Sykes for specific performance and to enjoin him from transferring his mineral rights to the disputed land. In early September, MCM's amended complaint named Max Ferre as a codefendant and adding various claims, including misrepresentation and intentional failure to perform on Sykes's part. The amended complaint demanded an award of punitive damages and requested full compensation for all expenses MCM might incur in recovering the disputed mineral rights.

Sykes's answer generally denied the complaint's allegations and advanced several defenses, including an allegation that MCM had engaged in misrepresentation[1] and a claim that Sykes had been mentally incapable of entering into the alleged contract.

MCM eventually negotiated a settlement with Ferre, acquiring the disputed mineral rights from him in exchange for $10,000 and his dismissal from the lawsuit. Ferre was dismissed as a defendant in October 1993.

MCM thereafter moved for summary judgment against Sykes, contending that there was no genuine issue of material fact as to the formation of the alleged contract or Sykes's subsequent breach of it by the sale to Ferre. Sykes opposed the motion and cross-moved for summary judgment.

The superior court denied Sykes's cross-motion and granted partial summary judgment to MCM, ruling from the bench that Sykes had entered into a valid contract to sell MCM the mineral rights and that he had subsequently breached this contract. Confusion subsequently arose as to the scope of the superior court's oral summary judgment order. As a result, on April 18, 1994, the court issued a written order clarifying that Sykes's defenses of misrepresentation and mental incapacity had not been foreclosed by the summary judgment order and that Sykes remained free to litigate these issues at trial.

Prior to trial, Sykes missed the deadlines for filing expert and non-expert witness lists, as set in the superior court's pretrial order. Sykes eventually submitted late witness lists and moved for leave to allow their untimely filing. He claimed that he had recently gone through a period of depression that had precluded him from meeting the original deadlines. The superior court denied Sykes's motion, ruling that he had failed to establish manifest injustice warranting departure from the pretrial order. The court concluded that Sykes "shall not be allowed to call any lay or expert witnesses in this trial" apart from witnesses already named on MCM's witness lists.

After a five-day bench trial, the superior court issued a decision in MCM's favor, resolving "all material facts .... against [Sykes]." Specifically, the court found that Sykes's testimony had been consistently untruthful. It rejected Sykes's defenses of misrepresentation and mental incapacity and found that he had intentionally breached his contract with MCM. The court further found that Sykes's breach forced MCM to incur substantial legal expenses before it managed

---

1. Sykes alleged that Tsigonis promised him that MCM wanted to acquire the mineral rights solely to aid in the development of scientific data for an environmental impact statement required for a mining project. Sykes asserted that MCM's actual intention was to build a water reservoir, a dam, pumps, pipelines, power lines, and roads.

to acquire the disputed mineral rights from Max Ferre. Based on these findings, the court declared Sykes liable to MCM for punitive damages and for all attorney's fees and costs paid by MCM through mid-October of 1993—the date of its settlement with Ferre. The court entered judgment against Sykes in the total amount of $159,259.16.[2]

Sykes appeals.

## II. DISCUSSION

### A. Summary Judgment

Sykes initially claims that the superior court erred in granting partial summary judgment to MCM.[3] In granting summary judgment, the court found no genuine issue of fact as to the formation of a valid contract or as to Sykes's later breach of that contract. Sykes contends that there was ample evidence to preclude summary judgment as to formation of a contract and breach.

▪ The elements of an express contract consist of an offer encompassing the agreement's essential terms, an unequivocal acceptance, consideration, and a mutual intent to be bound. *Young v. Hobbs*, 916 P.2d 485, 488 (Alaska 1996). The intent of the parties when entering into a contract is a question of fact. *Alaska Continental, Inc. v. Trickey*, 933 P.2d 528, 534 (Alaska 1997).

Below, Sykes raised two issues implicating the fourth element of contract formation—intent to be bound. Sykes contended that, despite his execution of a written agreement to sell mineral rights to MCM, no binding contract was ever formed, because he was mentally incapable of entering into a contract and because Tsigonis misrepresented MCM's planned use of the property. Sykes present-

ed various affidavits and his own deposition testimony to support these contentions.

▪ By claiming incapacity and misrepresentation and presenting evidence to support these claims, Sykes raised genuine issues of material fact as to the formation of a contract. We have previously recognized that summary judgment is not proper when the evidence before the superior court establishes a factual dispute as to the intent of contracting parties. *Martech Const. Co., Inc. v. Ogden Environmental Services, Inc.*, 852 P.2d 1146, 1149 (Alaska 1993).

As our earlier recitation of facts made clear, however, although the superior court initially indicated in an oral ruling that it had granted summary judgment as to the formation of a contract and its subsequent breach by Sykes, the court later issued a written order expressly informing the parties that Sykes was not foreclosed from asserting his claims of misrepresentation and incapacity: "[T]he court did not consider [incapacity or misrepresentation] in summary judgment. The court found, as a matter of law, [that] defendant entered into the contract with plaintiffs. Misrepresentation or incapacity may entitle defendant to [rescission] or other remedy and may be presented at trial."

The net effect of the court's written order was to narrow its earlier summary judgment ruling by construing it to find, as uncontroverted fact, the first three elements of contract formation—offer, acceptance, and consideration—while leaving open the fourth element—intent. The order also in effect found it uncontroverted that Sykes had failed to convey his mineral rights to MCM, as called for in his written agreement with Tsigonis; yet in reserving judgment on

---

**2.** The judgment consisted of compensatory damages of $105,508.55 (including attorney's fees and costs of $104,476.55 MCM had paid through the date of its settlement with Ferre), prejudgment interest of $10,303.25, punitive damages of $20,000, a discovery sanction of $250.00, costs of $7,116.18, and additional prevailing party attorney's fees of $16,081.18 calculated in accordance with Civil Rule 82(b)(1).

**3.** We review summary judgment rulings *de novo. Mount Juneau Enterprises, Inc. v. City of Juneau*, 923 P.2d 768, 772–73 (Alaska 1996). Our review is governed by the same rules that apply to

summary judgment at the trial court level: we view all evidence and reasonable inferences therefrom in the light most favorable to the non-moving party, *Foster v. City of Fairbanks*, 929 P.2d 658, 660 n. 4 (Alaska 1996); we make no attempt to weigh the evidence or evaluate the credibility of witnesses, *Gudenau & Co., Inc. v. Sweeney Ins., Inc.*, 736 P.2d 763, 765 (Alaska 1987); and we assume that all facts set forth in the non-movant's affidavits are true and capable of proof. *Id. See also Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1216 (Alaska 1991).

Sykes's claims of incapacity and misrepresentation, the order necessarily left open the ultimate issue of actionable breach.

 There was in fact no genuine dispute as to any of the issues the superior court ultimately found uncontroverted; the disputes in the case centered on the areas that the court's written order left open to litigation. Because the written order made it clear that Sykes remained free to litigate fully the issues of misrepresentation and mental incapacity, we find no error in the court's decision to grant partial summary judgment to MCM.[4]

### B. *Witness Preclusion*

Sykes next claims that the superior court erred in precluding him from calling witnesses to support his defense at trial. The challenged preclusion order resulted from Sykes's failure to file timely witness and expert witness lists.

In a pretrial order issued April 9, 1993, the superior court directed the parties to submit expert witness lists by December 27, 1993, and non-expert witness lists by January 18, 1994. The pretrial order also called for the parties to file case management memoranda by October 25, 1993. Sykes failed to file a case management memorandum by the October 25 deadline. On November 2, 1993, the court issued a *sua sponte* order directing Sykes to file the memorandum within fifteen days; in the same order, the court directed Sykes to "comply with all dates and required acts set forth in the Pretrial Order filed April 9, 1993, without further intervention of this court."

Sykes thereafter missed the December 27, 1993, and January 18, 1994, deadlines for filing expert and non-expert witness lists. On February 28, 1994, Sykes submitted untimely lists, together with a "Motion to Accept Late Filings" in which he claimed that his "deteriorated mental state" had prevented him from submitting the lists earlier. Specifically, Sykes asserted that his depressed condition had prevented him "even from opening his mail" when the filings were due. Sykes submitted information purporting to document his assertions.[5]

The superior court denied Sykes's motion to accept the late witness lists, finding that Sykes had failed to establish "good cause and manifest injustice for this court to grant him relief from the Pretrial Order." Although the court indicated that Sykes could "call any witness listed on the plaintiffs' witness list," it declared that he "shall not be allowed to call any lay or expert witnesses" who had not been so listed. The court went on to note that it "repeatedly ... has advised Mr. Sykes throughout these proceedings that the Pretrial Order deadlines provide him with plenty of notice and that the order would not be varied."

The case proceeded to trial; as a result of the preclusion order, Sykes was unable to

---

4. In connection with his summary judgment argument, Sykes also maintains that the trial court erred in considering the issue of breach, since, in Sykes's view, "breach of contract" was "never plead" and was "not even an issue in this suit." It is true that MCM's complaint did not expressly state a cause of action for breach. However, Alaska is a notice pleading state. Alaska R. Civ. P. 8(a); *see also Great Western Savings Bank v. George W. Easley Co.*, 778 P.2d 569, 577 (Alaska 1989). Civil Rule 8(a) requires only a "short and plain statement of the claim" that will give the defendant fair notice of the claim and the grounds upon which it rests. *Great Western*, 778 P.2d at 577. Pleadings must be liberally construed, with the goal of achieving substantial justice. Alaska R. Civ. P. 8(f); *see also Gamble v. Northstore Partnership*, 907 P.2d 477, 482 (Alaska 1995). A cause of action is sufficiently pled if it provides the defendant with fair notice of the nature of the claim. *See id.* Under these standards, the amended complaint in this case sufficed to state a claim for breach.

5. Sykes filed a packet of medical reports and other documents from the Wasatch Mental Health Clinic in Utah, where he was a patient. The packet included a February 3, 1994, affidavit of David Kohler, a Clinic social worker. Kohler confirmed that Sykes suffered from "various mental disorders" for which he had received treatment and been prescribed various medications. Kohler went on to state that a prior psychological evaluation of Sykes (a copy of which was attached) had noted that Sykes's involvement in litigation generated anxiety "so traumatic as to prevent him from opening mail for months." Kohler claimed that "I too have personally observed this high anxiety concerning mail[.] ... This was especially true in his December and January failure to open important mail on his Alaska case."

call any of the persons named in his expert witness list, because none of them had been listed as MCM witnesses. All had been designated by Sykes to testify about his claim of mental incapacity.[6] Sykes attempted to prove this claim through his own testimony and the testimony of his wife. In rendering judgment against Sykes, the trial court rejected his mental incapacity defense as wholly incredible. Sykes now challenges the preclusion order as erroneous.

■ According to Alaska Civil Rule 16(e), pretrial orders setting filing dates and other deadlines "shall control the subsequent course of the action unless modified by a subsequent order." *Id.* The order may be modified to prevent "manifest injustice." *Id.* The discretion to modify a pretrial order rests in the trial court. *City of Kotzebue v. McLean*, 702 P.2d 1309, 1316 (Alaska 1985). The burden is on the party seeking modification to show manifest injustice. *Johnson v. State*, 636 P.2d 47, 58 (Alaska 1981).

For present purposes, we may assume that the trial court did not abuse its discretion in finding that Sykes had failed to show manifest injustice warranting modification of the pretrial order. This assumption, however, does not resolve the controversy. For although the trial court did not expressly say so, its order rejecting the untimely lists in their entirety and precluding Sykes from calling witnesses at trial amounted to a sanction for Sykes's violation of the pretrial order. The appropriateness of the preclusion order must be considered under the ground rules governing sanctions.

■ Under Civil Rule 16(f), a party's violation of a pretrial order empowers the court to "make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B),(C),(D)." *Wasserman v. Bartholomew*, 923 P.2d 806, 811 (Alaska 1996).[7] One sanction enumerated in Rule 37(b)(2) for violation of a pretrial order is "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." Alaska R. Civ. P. 37(b)(2)(B). The trial court's order precluding Sykes from calling expert witnesses falls squarely within this language.

■ Ordinarily, the choice of a particular sanction for a discovery violation is a matter committed to the broad discretion of the trial court, subject only to review for abuse of discretion. *Hughes v. Bobich*, 875 P.2d 749, 752 (Alaska 1994). However, we have repeatedly held that the trial court's discretion is limited when the effect of the sanction it selects is to impose liability on the offending party, establish the outcome of or preclude evidence on a central issue, or end the litigation entirely.[8] Before extreme sanctions of this kind may properly be imposed,

[t]here must be 'willful noncompliance' with court orders, or 'extreme circumstances,' or 'gross violations' of the Rules.

---

**6.** In contrast, given that Sykes was not precluded from calling persons named on MCM's witness lists, all but one of the lay witnesses included in Sykes's lay witness list actually testified at trial. The only non-testifying lay witness named on Sykes's list was the original owner of the disputed property; the record provides no indication that her proposed testimony would have been relevant to Sykes's claims of incapacity or misrepresentation.

**7.** Civil Rule 37(b)(2) itself allows the court to impose sanctions when a party "fails to obey an order to provide or permit discovery[.]" This provision is sufficiently broad to cover a party's failure to obey witness list deadlines established in a pretrial order issued pursuant to Civil Rule 16. We note that the current version of Civil Rule 37(b)(2), which was promulgated after this case was tried, *see* Alaska Supreme Court Order No. 1172 (effective July 15, 1995), expressly provides that sanctions under Rule 37(b)(2) may be imposed "if a party fails to obey an order entered under Rule 16(e)[.]" The current version of the rule thus allows the trial court to impose Civil Rule 37(b)(2) sanctions for a party's failure to obey any provision of a pretrial order, regardless of whether the provision relates to discovery obligations.

**8.** *See, e.g., Arbelovsky v. Ebasco Services, Inc.*, 922 P.2d 225, 227 (Alaska 1996); *White Mountain Mining Partners v. Ptarmigan Co., Inc.*, 906 P.2d 1357, 1362–64 (Alaska 1995); *Spenard Action Comm. v. Lot 3, Block 1, Evergreen Subdivision*, 902 P.2d 766, 776 (Alaska 1995); *McGilvary v. Hansen*, 897 P.2d 605, 607 (Alaska 1995); *Fairbanks N. Star Bor. v. Lakeview Enter.*, 897 P.2d 47, 58 (Alaska 1995); *Hughes v. Bobich*, 875 P.2d at 752; *Underwriters at Lloyd's London v. The Narrows*, 846 P.2d 118, 120–22 (Alaska 1993).

The record must also 'clearly indicate a reasonable exploration of possible and meaningful alternatives to dismissal.' ... If meaningful alternative sanctions are available, the trial court must ordinarily impose these lesser sanctions....

*Arbelovsky*, 922 P.2d at 227 (citation and footnotes omitted).[9]

This court has recently amended Civil Rule 37(b) to include an express statement of these principles. In its present form, the rule specifically provides that a court "shall not make an order that has the effect of establishing or dismissing a claim or defense or determining a central issue in the litigation unless the court finds that the party acted willfully."[10] Although this provision was not in effect when the trial court entered the disputed order precluding Sykes from calling expert witnesses, its language summarizes the requirements then applicable under existing case law.

For the present case, there seems to be little question that the preclusion order issued against Sykes "ha[d] the effect of ... determining a central issue in the litigation[.]" Civil Rule 37(b)(3). Apart from questions relating to damages, the primary issues surviving the superior court's summary judgment order were Sykes's claims of mental incapacity and misrepresentation. While the order precluding Sykes from calling witnesses seemingly had little direct effect on his claim of misrepresentation,[11] it had extreme consequence for his mental incapacity defense: all of the witnesses named by Sykes as experts were slated to testify about Sykes's condition at the time the contract was formed. None of these experts appeared on MCM's witness lists. Hence, to establish his mental incapacity defense at trial, Sykes was left with little but his own testimony—readily impeachable as self-serving[12]—and the testimony of his wife—equally vulnerable to attack as biased. Given the absence of ostensibly neutral expert testimony, the trial court's rejection of Sykes's incapacity defense as incredible hardly seems surprising.

Even though the witness preclusion order appears to have had the effect of determining the central issue of mental incapacity, the superior court did not make any finding as to whether Sykes had wilfully violated the pretrial order;[13] indeed, the court did not expressly reject Sykes's explanation for his failure to file timely witness lists—his depressed emotional condition.

Nor did the court specifically address the discovery violation's impact on MCM's case.

---

**9.** These limitations apply regardless of whether the sanction is imposed under Civil Rule 37 or for violation of another rule. *Arbelovsky*, 922 P.2d at 227.

**10.** *See* Civil Rule 37(b)(3), *adopted by* Alaska Supreme Court Order No. 1172 (effective July 15, 1995). Subparagraph (b)(3) now provides:

(3) *Standard for Imposition of Sanctions.* Prior to making an order under sections (A), (B), or (C) of subparagraph (b)(2) the court shall consider

(A) the nature of the violation, including the willfulness of the conduct and the materiality of the information that the party failed to disclose;

(B) the prejudice to the opposing party;

(C) the relationship between the information the party failed to disclose and the proposed sanction;

(D) whether a lesser sanction would adequately protect the opposing party and deter other discovery violations; and

(E) other factors deemed appropriate by the court or required by law.

The court shall not make an order that has the effect of establishing or dismissing a claim or defense or determining a central issue in the litigation unless the court finds that the party acted willfully.

**11.** *See* footnote 6, above. To the extent that the preclusion order disarmed Sykes's mental incapacity defense, however, it had an indirect impact on the misrepresentation claim as well, since that claim was based in part on Sykes's assertion that his emotional state made him particularly vulnerable to Tsigonis's repeated contacts concerning acquisition of Sykes's mineral rights.

**12.** As we have observed in other contexts, there is little probative value to be found in self-serving testimony by parties concerning their subjective intent upon entering into a contract. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981); *see also Day v. A & G Const. Co., Inc.*, 528 P.2d 440, 444 (Alaska 1974).

**13.** Wilfulness, in this context, requires a "conscious intent to impede discovery, and not mere delay, inability or good faith resistance." *Spenard Action Comm.*, 902 P.2d at 776 (quoting *Underwriters*, 846 P.2d at 119).

The record provides little indication that accepting Sykes's untimely lists would have caused MCM serious prejudice: Sykes's claim of mental incapacity and the basic nature of that claim were known to MCM from the outset of the case. The witnesses named by Sykes to support this claim were health care professionals who had provided ongoing treatment to Sykes; their identities, and a number of their reports, were available to MCM in other pleadings. Although the untimely lists were filed after discovery had closed, the tardiness posed no obvious obstacle to MCM's ability to prepare for trial; to the contrary, the record reveals that the originally scheduled trial date was eventually postponed to accommodate the parties' mutual request for a supplemental deposition of another witness.

Moreover, before entering its witness preclusion order, the trial court evidently failed to consider any less drastic sanctions. At the time Sykes missed the deadlines for filing his witness lists, no discovery sanctions had been imposed or threatened.[14] The record discloses no basis for concluding that a sanction less extreme than wholesale preclusion would not have been effective.

Given the totality of these circumstances, "we [are] left with the definite and firm conviction on the record that the judge ... made a mistake" [15] in striking all of the expert witnesses named in Sykes's untimely expert witness list. The preclusion order's harsh effect on Sykes's defense of mental incapacity rendered this sanction disproportionate to the severity of the violation for which it was imposed. The trial court abused its discretion in imposing the sanction.

This error requires that the judgment entered below be vacated and that this case be remanded for further proceedings. Because the case was tried to the court without a jury, however, a new trial will not be necessary. Instead, the trial court may reconsider its original decision after receiving supplemental testimony from Sykes's designated experts and from any additional witnesses MCM chooses to present in response to the new evidence.[16]

### C. Attorney's Fees as Compensatory Damages

■■■ Sykes additionally challenges the trial court's decision to award attorney's fees, both as compensatory damages for Sykes's breach and under Alaska Civil Rule 82. MCM correctly points out that Sykes has failed to include this issue in his points on appeal. Accordingly, the point is not properly preserved.[17] Moreover, Sykes's conclusory briefing of the point would warrant a finding of abandonment.[18] While these considerations dissuade us from attempting to resolve Sykes's arguments, some brief comments on the attorney's fees issue are in

---

**14.** Before Sykes missed these deadlines, the court did issue, in response to Sykes's earlier failure to file a timely case management memorandum, an order directing his ongoing compliance with the deadlines established in the pretrial order. Additionally, also before the witness lists fell due, MCM filed a motion to compel discovery and impose sanctions; this motion stemmed from a matter unrelated to the witness lists—Sykes's refusal to answer certain questions in his own deposition and his objections to certain questions in the deposition of another witness—and eventually led the court to impose a $250 sanction and to warn Sykes of the potential for litigation-ending sanctions in the event of additional discovery violations. The warning and sanctions, however, occurred after the witness list deadlines had already passed.

**15.** City of Kotzebue v. McLean, 702 P.2d 1309, 1316 (Alaska 1985) (quoting Bertram v. Harris, 423 P.2d 909, 917 (Alaska 1967)).

**16.** The parties should of course be given time to conduct additional discovery, as necessary, to prepare for the supplemental proceedings on remand.

**17.** "Generally, we will consider nothing but the points in an appellant's statement of points on appeal." Johnson v. Johnson, 836 P.2d 930, 935 (Alaska 1992); see also Alaska Appellate Rule 204(e); Braun v. Alaska Commercial Fishing & Agric. Bank, 816 P.2d 140, 145 (Alaska 1991); Wetzler v. Wetzler, 570 P.2d 741, 742 n. 2 (Alaska 1977).

**18.** See Hitt v. J.B. Coghill, Inc., 641 P.2d 211, 213 n. 4 (Alaska 1982); see also Legge v. Greig, 880 P.2d 606, 609 (Alaska 1994).

order, both in the interest of justice [19] and to provide guidance to the trial court on remand.

As we have already explained, Sykes signed a written agreement to sell MCM his mineral rights for $10,000; his refusal to follow through on the agreement led MCM to file suit against him, alleging, among other things, that he had intentionally failed to honor the contract. After learning that Sykes conveyed the rights to Ferre, MCM joined Ferre as Sykes's codefendant. MCM later agreed to acquire the rights from Ferre for $10,000—the same price previously agreed upon with Sykes; upon receiving a deed from Ferre, MCM dismissed its suit against him but persisted in its claims against Sykes.

In continuing to press its action against Sykes, MCM claimed that Sykes should be held responsible for all costs MCM had incurred as a result of Sykes's breach—including the full costs of MCM's litigation, through settlement with Ferre. Upon conclusion of trial, the superior court ruled in favor of MCM on this issue, declaring that MCM was "entitled to recover these legal expenses from Mr. Sykes as contractual and tort damages for his intentional breach of the Agreement and his misrepresentation and fraud." These fees, incurred before the MCM/Ferre settlement, totaled slightly more than $105,000.[20]

After receiving the favorable verdict, MCM moved for an award of prevailing party attorney's fees to cover legal services rendered after the MCM/Ferre settlement.

Emphasizing the intentional nature of Sykes's breach, MCM argued for an award of full fees, from the settlement date through trial.[21] The trial court denied MCM's request for full compensation but awarded partial attorney's fees "computed pursuant to Civil Rule 82(b)(1)"—that is, calculated as a percentage of MCM's judgment, which already included full compensation for presettlement legal fees and costs.

We have previously held that attorney's fees generally cannot be awarded as damages—that fee awards are instead controlled by Civil Rule 82. *Ehredt v. DeHavilland Aircraft Co. of Canada*, 705 P.2d 446, 452 n. 8 (Alaska 1985). In *Curt's Trucking Company v. City of Anchorage*, 578 P.2d 975 (Alaska 1978), we concluded that costs of protecting one's legal claim are unrecoverable as damages. *Id.* at 981. Likewise, in *Alaska Pacific Assurance Company v. Collins*, 794 P.2d 936 (Alaska 1990), we stated that "[o]ur trial courts are precluded from awarding fees other than those allowed by 'rule or order.'" *Id.* at 949 (quoting AS 09.60.010) (footnote omitted).[22] We thus found error in the superior court's allowance of an award of legal fees as compensatory damages on a tort claim involving bad faith failure to provide insurance coverage. *Id.*

In his treatise on contracts, Professor Corbin recognizes an exception to the general rule against attorney's fees that permits reasonable expenditures for litigation to be awarded when a defendant's breach of contract results in litigation between the plaintiff and a third party. *See* Arthur L. Corbin, 5 *Corbin on Contracts* § 1037, at 225–26, 234

**19.** *Cf. Winn v. Mannhalter*, 708 P.2d 444, 449 (Alaska 1985); *Mullen v. Christiansen*, 642 P.2d 1345, 1351 (Alaska 1982) (Matthews, J., concurring); *Miller v. City of Fairbanks*, 509 P.2d 826, 829 (Alaska 1973); *Orbeck v. Wheeler Constr. Co.*, 394 P.2d 781, 783 (Alaska 1964) (all indicating that relaxation of the appellate rules is appropriate when called for in the interest of justice).

**20.** In reference to the amount of the fees, the court stated,

> Although these fees are a large amount, the court finds that in light of the actions taken by Mr. Sykes to avoid performing the contract he entered into with the plaintiffs to sell the Mineral Estate and the actions he took in the course of this litigation with [MCM], the fees

are not unreasonable and are compensatory damages which flow directly from Sykes' breach of contract.

**21.** In its motion, MCM argued that "Rule 82(b)(3) authorizes the court to vary an attorney's fees award which would have otherwise been calculated pursuant to the percentages set forth in Rule 82(b)(1), by considering, among other things, the reasonableness of the claims and defenses pursued by each side[.]"

**22.** Although in *Collins* we did recognize the existence of certain "exceptions to the general principle that attorney's fees are to be governed by Rule 82," 794 P.2d at 949 n. 15, none of the exceptions we described would be applicable here. *Id.*

(1964). Yet Corbin emphasizes that this exception to what he calls "the American rule against recovery of attorneys' fees" is a limited one:

> This treatise has always supported recovery of attorneys' fees incurred at *another time,* incurred in *another place,* and incurred in *another lawsuit* than the action in which indemnity has been sought. It is another matter entirely to say that ... claims against different people in the *same* lawsuit, in the *same* place, and capable of being heard at the *same* time, should be treated as *different lawsuits* for the purpose of invoking that exception to the American rule.

*Id.* § 1037, at 86–87 (Supp.1997) (emphasis in the original).

■ MCM evidently called none of these authorities to the superior court's attention; and the superior court cited no authority supporting its treatment of attorney's fees as compensatory damages. Given the serious legal question surrounding the propriety of this award, we conclude that, on remand, if the superior court again finds that Sykes should be held liable for misrepresentation and breach, the court should reconsider its compensatory damage award; and if the court again finds that attorney's fees should be treated as compensatory damages, it should fully explain the legal basis for its finding.[23]

### D. *Other Issues*

■ Sykes argues two other issues, which require only brief mention. Sykes argues that the trial court repeatedly erred in admitting "irrelevant, prejudicial, hearsay testimony." Sykes's arguments, however, are conclusory; moreover, his failure to have any portion of the trial transcribed precludes

meaningful appellate review of the issue.[24] We decline to consider the point.

■ Sykes also argues that the trial court erred in failing to "partition" damages between himself and Ferre. Sykes briefs this issue cursorily and cites no supporting authority for his position. We deem the argument abandoned. *Braun v. Alaska Commercial Fishing & Agric. Bank,* 816 P.2d 140, 145 (Alaska 1991).

### III. *CONCLUSION*

We conclude that the superior court abused its discretion in precluding Sykes from calling witnesses listed on his expert witness list. We thus REVERSE the preclusion order, VACATE judgment entered below, and REMAND for further proceedings as indicated herein.

---

23. Because the court included pre-settlement attorney's fees in the compensatory damages award, its decision to award partial attorney's fees in accordance with the Civil Rule 82(b)(1) schedule also had the effect of doubly compensating MCM for the pre-settlement fees. At the same time, this approach left MCM's post-settlement fees essentially uncompensated. In the event the court decides again on remand to treat pre-settlement attorney's fees as compensatory damages, it should reconsider its approach to Rule 82 prevailing party fees and fully explain any resulting award.

24. "[A] party's failure to designate portions of the record that are necessary to allow the determination of a point on appeal will amount to a waiver or abandonment of that point." *Miscovich v. Tryck,* 875 P.2d 1293, 1304 (Alaska 1994); *see also Adrian v. Adrian,* 838 P.2d 808, 811 (Alaska 1992) ("[F]ailure to designate the trial transcript as part of the record makes it impossible for us to review this issue as there is no way to know the quality or quantity of the testimonial evidence presented at trial.").